UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Philadelphia Taxi Association, Inc.<br>922 Thornton Drive<br>Horsham, PA 19044<br>and<br>Aamir Trans., Inc.<br>Aannyia Trans., Inc.<br>Abaas Trans., Inc.<br>Abnik Inc.<br>Amraan Trans., Inc.<br>Atma Cab Inc.<br>Aumbreen<br>Avinith Brothers Corp.<br>Bains Transportation, Inc.<br>Balan Cab Co.<br>BAM ARG Inc.<br>Billa Cab Co.<br>B&M Transport, Inc.<br>Chaudhry Cab Inc.<br>C.S. Cab Co.<br>Dashmesh Cab Corp.<br>Daya Enterprises Inc.<br>Daya Transportation Inc.<br>Dhamthal Trans Inc.<br>Dhesi Cab Co.<br>E&S Trans Inc.<br>Golden Temple Corp.<br>Guru Cab Co.<br>Guru Trans., Inc.<br>Gurveer Cab Co.<br>Harry Dillon Cab Co.<br>H bhatti<br>H & J Cab Co.<br>Hsp Cab Co.<br>Inder Transport Inc.<br>I & S, MaGassa Inc.<br>JAI Luxmi Inc.<br>Jen-Kho Trans.<br>JFK Transit Inc.<br>JRK Cab Co.<br>J.K.P. Transport, Inc.<br>J & H Cab Co.<br>Kamal d Inc. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.: 3:16-cv-<br>)<br>)   JURY TRIAL DEMANDED<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Kashif Corp.                                    )
Kejsi & Au Lona Cab Co.                         )
Khadim Trans Inc.                               )
Khayyam Inc.                                    )
Khkhoar Taxi Cab                                )
kHokha Group USA                                )
Km Taxi, Inc.                                   )
K. Singh Cab, Inc.                              )
Maher Cab Co.                                   )
Manna S. Inc.                                   )
M&M Trans Inc.                                  )
Nasrin Trans Inc.                               )
Navid Inc.                                      )
Navjot Cab Company                              )
Nijjar Cab Co.                                  )
One Cab Inc.                                    )
Parveen Transport Inc.                          )
Prabh Inc.                                      )
Pun Jab Corp.                                   )
P. K. Cab                                       )
Raja Cab Co.                                    )
Rajdeep Cab Inc.                                )
Ramtin Inc.                                     )
Rasul Corp.                                     )
Saas Cab Co.                                    )
Sahota Cab Co.                                  )
SANAZ, Inc.                                     )
Sardar Cab Co.                                  )
Setareh Cab Co.                                 )
Shaad Cab Inc.                                  )
Shawn Limo                                      )
Shivam Cab Corp.                                )
Singh Maan Inc.                                 )
T.S. Malhi Cab Co.                              )
Zadeh Inc.                                      )
Zahd Trans Inc.                                 )
Zari Cab Co.                                    )
                              Plaintiffs,       )
                                                )
            v.                                  )
Uber Technologies, Inc.                         )
182 Howard Street, #8                           )
San Francisco, CA 94105                         )
                              Defendant.        )

2

## COMPLAINT

## I.      INTRODUCTION

1.      Plaintiff Philadelphia Taxi Association, Inc. ("PTA"), is a nonprofit corporation registered with the Pennsylvania Bureau of Corporation Taxes. The PTA consists of corporations which provide public access to safe and uniform means of vehicle-for-hire transportation within, and originating within, the City and County of Philadelphia. The PTA represents the interests of its members and on behalf of its membership seeks Injunctive Relief, pursuant to 15 U.S.C. §26 for violations of §2 of the Sherman Antitrust Act, as set forth in ¶¶ 5, 15-53, *infra.*

2.      Each of the individually named Plaintiffs (hereinafter "Individual Plaintiffs") are corporations which provide public access to safe and uniform means of vehicle-for-hire transportation within, and originating within, the City and County of Philadelphia. In accordance with 15 U.S.C. §15, Individual Plaintiffs seek to recover the damages they have sustained, and continue to sustain as a result of Defendant Uber Technologies, Inc.'s continuing attempts to monopolize the market for the provision of public access to safe and uniform means of vehicle-for-hire transportation within, and originating within, the City and County of Philadelphia.

3.      Contrary to Defendant's marketing efforts to be perceived simply as a Transportation Network Company ("TNC"), a court of competent jurisdiction has found Defendant to be in the same relevant product/service and geographic markets as the Individual Plaintiffs, and consequently subject to the rules and regulations governing the provision of public access to safe and uniform means of vehicles-for-hire transportation within, and originating within, the City and County of Philadelphia. *See,* ¶¶ 42, 15 - 30, *infra.*

3

4.    Defendant has repeatedly and willfully ignored the rulings of the court of competent jurisdiction and willfully violated each and every rule and regulation governing the provision of public access to safe and uniform means of vehicles-for-hire transportation within, and originating within, the relevant markets referenced above and defined in ¶¶ 13 - 14, *infra.* Defendant's conduct is designed to lessen or destroy competition in said markets.

5.    The United States Supreme Court in its most recent decision on attempted monopolization has stated:

> The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which *unfairly tends to destroy competition itself.* It does so not out of solicitude for private concerns but out of concern for the public interest.

*Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447 at 458 (1993), emphasis added.

6.    In addition to the Individual Plaintiffs' claim arising from Defendant's continuing attempts to monopolize in violations of §2 of the Sherman Antitrust Act, the Individual Plaintiffs also have claims which arise from Defendant's intentional interference with contractual relationships and unfair competition. *See,* ¶¶ 54 - 71, *infra.*

## II.    PARTIES

7.    Plaintiff PTA, is a nonprofit corporation registered with the Pennsylvania Bureau of Corporation Taxes, having a place of business at 922 Thornton Drive, Horsham, Pa. 19044.

4

8.    The Individual Plaintiffs are Pennsylvania corporations operating within Philadelphia, to provide public access to safe and uniform means of vehicle-for-hire transportation within, and originating within, the City and County of Philadelphia.  Each of the Individual Plaintiffs participates in the medallion system and is an owner of medallions, as described at ¶¶18 - 30, *infra.*  At all times, each of the foregoing corporations have been and is an association member of Plaintiff PTA.

9.    Defendant Uber Technologies, Inc., is a Delaware Corporation which maintains its principle place of business at 182 Howard Street, #8, San Francisco, CA 94105.

### III.    JURISDICTION

10.    This Court has jurisdiction over the parties pursuant to 28 USC §1931; 15 USC §§ 1, 2, 4 & 15; and 28 USC §1367, in that this Complaint asserts claims for a violation of the Sherman Antitrust Act and State law claims related substantially to the federal antitrust claim set forth below.  This Court has jurisdiction over the Defendant in that it is doing business in Philadelphia, Pa., as set forth below.

11.    This Court has jurisdiction over the parties and over the subject matter of the causes of action asserted under the State law claims at Counts II and III, pursuant to 28 U.S.C. §1332(a),  in that there is diversity of citizenship between each of the Plaintiffs, who are organized pursuant to the corporate laws of the Commonwealth of Pennsylvania, and Defendant, a Delaware Corporation with a home office in San Francisco, California; and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs; and the events giving rise to the aforesaid causes of action occurred in the Eastern District of Pennsylvania.

### IV. VENUE

12.     Venue properly lies in the Federal District Court for the Eastern District of Pennsylvania in that the Defendant is doing business and has committed those acts complained of in Philadelphia, Pennsylvania.

### V. FACTS

#### A. The Relevant Markets

13.     Plaintiffs are in a service industry. Their service market is the provision of public access to safe and uniform means of vehicle-for-hire transportation, in this situation specifically taxicab service.

14.     The geographic market is the city and county of Philadelphia.

#### B. Uber's Ongoing Attempt To Monopolize  the Relevant Markets

##### 1. Structure of the Relevant Markets Prior To October 2014

15.     Through the Act of July 16, 2004, P.L. 758, No. 94 ("Act 94"), the Commonwealth of Pennsylvania transferred regulatory jurisdiction over the provision of public access to safe and uniform means of vehicle-for-hire transportation originating within the City and County of Philadelphia to The Philadelphia Parking Authority ("PPA"). Said jurisdiction is exclusive pursuant to Chapter 55 of Title 53, 53 Pa.C.S. §5501 to 5517.

16.     In order to ensure public access to safe and uniform means of vehicle-for-hire-transportation in the relevant markets, the PPA promulgated regulations, compliance with which requires substantial financial outlay.

17.     The PPA promulgated regulations provide for a Taxicab and Limousine Division of the PPA for the purpose of implementing and enforcing the PPA promulgated regulations.

6

18.    In order to operate a vehicle-for-hire  within a Commonwealth of Pennsylvania city of the first class (Philadelphia), the vehicle must have a PPA "Certificate of Public Convenience" or "Certificate."   53 Pa.C.S.A. §5711 - *Power of Authority to Issue Certificates of Public Convenience.*

19.    For  the vehicle-for-hire more commonly known as a taxicab there are two different Certificates which are issued.  One which permits the transport of people and their baggage: (i) between specified points in parts of the City as identified on the Certificate; (ii) from the Certificate specified points in the City to any point in the Commonwealth; (iii) from any point in the Commonwealth to the specified points in the City as identified on the Certificate *if* the request for service is received by a call to its dispatch service; and (iv) from any of its certified areas in the City to any point outside of the Commonwealth as part of a continuous trip.  Such cabs are known as Partial Rights Cabs ("PRC").

The second is a Certificate providing for Medallion Cabs.  Medallion Cabs may transport people and their baggage:(i) throughout the City; (ii) from any area in the City to any point in the Commonwealth; (iii) from any point in the Commonwealth to any point in the City *if* the request for service is received by a call to its dispatch service; and (iv)  from any area in the City to any point outside of the Commonwealth as part of a continuous trip.

20.    In 2005, the Commonwealth of Pennsylvania mandated the establishment of a medallion system within the City and County of Philadelphia in order to provide holders of certificates of public convenience which authorize citywide call or demand service the opportunity to upgrade and improve the operations of taxicabs.  53 Pa.C.S.A. §5712 - *Medallion system.*

21.    At the time the Commonwealth of Pennsylvania mandated the implementation of a medallion system within the City and County of Philadelphia the value of a medallion was $65,000.00.  By September 30, 2014, the upgrade in, and improvement of,  the operation of taxicabs in the relevant market resulted in the value of a medallion being $550,000.00.

22.    Medallions are property and may not be revoked or canceled by the PPA. Medallions may be pledged to lenders or creditors as security on debt.  53 Pa.C.S.A. §5713(a) - *Property and licensing rights.*

A certificate of public convenience is a licensing right which accompanies each medallion and authorizes the operation of one taxicab within a city of the first class (Philadelphia).  No property interest exists in the certificate itself.  A certificate may not be pledged to lenders or creditors as security on debt.  A certificate may be canceled by the PPA, upon due cause shown, for violation of the PPA regulations as set forth in ¶¶ 23 - 27, *infra.*  If the PPA cancels a certificate , the certificate holder shall have the right to sell the accompanying medallion within six months of the date of the certificate cancellation, and the certificate holder must turn the medallion over to the PPA within five days of cancellation of the certificate for safekeeping until the medallion is sold.  If the medallion is not sold within six months the medallion will become nontransferable, and possession must be surrendered to the PPA.  53 Pa.C.S.A. §5713(b) - *Property and licensing rights.*

23.    A vehicle may not be operated as a taxicab with citywide call or demand rights in cities of the first class (Philadelphia) unless a certificate of public convenience is issued by the PPA *and* a medallion is attached to the hood of the vehicle.  53 Pa.C.S.A. §5714(a)(1) - *Certificate and medallion required.*

8

24.    Each certificate holder shall pay at least a prevailing minimum wage rate or, in the alternative, charge at most a prevailing maximum lease amount to the drivers of its taxicab, as determined by the PPA upon investigation. The minimum wage rate and the maximum lease amount may include employee benefits. 53 Pa.C.S.A. §5720 - *Wages*

25.    Certificate Holders and Medallion Holders are legally and operationally responsible for daily supervision of the vehicles and drivers used to provide service. They must provide/maintain a vehicle(s) in compliance Commonwealth of Pennsylvania transportation equipment inspection standards. The vehicles can not be more than eight years old, nor can they first be used in the industry if they have 135,000 miles on them and under no circumstances if they have 250,000 miles. The vehicles must be insured for up to $30,000.00.

26.    Certificate Holders and Medallion Holders may only use the services of drivers who have obtained a drivers certificate demonstrating compliance with the PPA regulations, *inter alia,* passing an English proficiency test; providing his/her Social Security card; passing a Motor Vehicle Records review; submitting a driving record for the three years preceding application to the PPA, from every state he/she resided in or has held a driver's license during that period; showing proof of a current valid driver's license; demonstrating an absence of conviction for a DUI within the past (3) years; demonstrating the absence of accumulated driving offenses that would have equaled nine (9) points within the past (3) years in Pennsylvania or the equivalent severity of violations in other states; and providing a signed form by a physician representing that the individual is physically able to safely drive a vehicle to transport paying passengers.

9

27.    Certificate Holders and Medallion Holders must post a bond, in the penal sum of ten thousand ($10,000) dollars, containing one or more sureties approved by the PPA to pay all fines for violating the regulations; or to pay or satisfy all judgments awarded for damages to any person found to have been caused by the Certificate Holder/Medallion Holder, his or her agents or employees, while acting within the scope of their employment, made committed or omitted in the business conducted under the PPA regulations, or caused by any other violation in carrying on the business as an Operator.

28.    Within the relevant markets there are vehicles-for-hire  companies which (a) own a fleet of vehicles, have their own mechanics and dispatchers and employ drivers or lease the vehicles to drivers; (b) own vehicles, out source maintenance and dispatchers and lease the vehicles to drivers; or (c) simply own medallions.  Prior to October 2014, regardless of the individual vehicles-for-hire company's business plan, all of said companies, complied with the PPA's regulation and the rules which fostered competition.

29.   The existence of the medallion system, and the ability to pledge medallions to lenders or creditors as security on debt enabled the Individual Plaintiffs to fund operations to maintain the provision of public access to safe and uniform means of vehicle-for-hire transportation. The improved quality of the taxicab service in the relevant market made the taxicab form of transportation more appealing to consumers.  Ridership increased, profitability increased, and  the value of medallions rose from $65,000 in 2005 to $550,000 in October 2014. An orderly, competitive market of 1,600 medallion cabs existed.

30.    The relevant market anticipated that 150 new medallions would be sold over the next seven years to accommodate the growth in demand.

10

### C. Uber's Conduct Designed to Destroy Competition in the Relevant Market

31. In October 2014, Uber entered the market for the provision of public access to safe and uniform means of vehicles-for-hire transportation within, and originating within, the City and County of Philadelphia. It did so by engaging in predation. It did not secure (a) Certificates of Public Convenience, or (b) Medallions. It did not (a) assume legal and operational responsibility for daily supervision of the vehicles and drivers used to provide Uber's service; (b) post bonds, in the penal sum of ten thousand ($10,000) dollars, containing one or more sureties approved by the PPA to pay all fines for violating the regulations; or to pay or satisfy all judgments awarded for damages to any person found to have been caused by Uber's agents or employees, while acting within the scope of their employment, made committed or omitted in the business conducted under the PPA regulations, or caused by any other violation in carrying on the business as an Operator; nor did it (c) pay at least a prevailing minimum wage rate or, in the alternative, charge at most a prevailing maximum lease amount to its drivers. Through the foregoing predation Uber reduced its operational cost per vehicle by a minimum of $576,000.00.

32. Because Uber intentionally sought to evade the statutory provisions and regulations of the PPA by denominating itself as a "Transportation Network Company" it conducted it's taxicab operation by owning no vehicles and employing no drivers.

33. Instead, the drivers that it retained, many of whom it improperly lured away from the Individual Plaintiffs, as set forth in ¶ 35 *infra*, used their own vehicles to transport members of the riding public and in many instances, did not have the proper commercial insurance needed to protect both the riding public and other members of the public.

11

34.    The drivers retained by Uber evaded all of the required statutory provisions and regulations of the PPA and also did not incur the substantial cost they would have been required to incur if they had been complying with the legal requirements as set forth in ¶¶ 18 - 27, & 31, *supra.*

35.    Uber launched a campaign to drive the Individual Plaintiffs and their rivals (all participants in the medallion system mandated by 53 Pa.C.S.A. §5712) out of business. Starting in October 2014, and continuing through to the present, Uber sends its business representatives to the 30th Street Railroad Station and the Philadelphia International Airport where the Individual Plaintiffs' taxi drivers congregate on a daily basis for the purpose of transporting customers and offer the drivers monetary inducements, written material and applications for becoming Uber drivers. The monetary inducements, include but are not limited to, offers to pay a sum certain to cover gasoline purchases for an initial period of time and bounties for luring other drivers from the Individual Plaintiffs and their rivals to Uber.

36.    At the present time, and only over the course of eighteen months since Defendant Uber began doing business in Philadelphia, it has succeeded in getting 1,200 of these drivers (17% of the 7,000 drivers employed by medallion cab owners) to leave, *inter alia*, the Individual Plaintiffs and go to work for Defendant Uber.

37.    Defendant Uber's campaign to drive existing cab companies out of business is succeeding. The loss of drivers and the inability of the Individual Plaintiffs to find drivers to replace those who have gone over to Defendant Uber has resulted in medallion cabs owned by the Individual Plaintiffs to sit idle, decreasing income and placing the financing available to the Individual Plaintiffs at risk. Medallions valued at $550,000.00 in October 2014 are now valued

12

at $80,000.00. Medallions pledged to lenders or creditors as security on debt are no longer sufficient collateral of outstanding loans. Currently, 15% of the medallions have been confiscated by lenders.

38. Defendant Uber has been excluding its rivals, the bona fide medallion cabs, on a basis other than efficiency.

### D. Uber's Intent to Destroy Competition or Obtain a Monopoly

39. At all relevant times Defendant Uber had knowledge of the regulatory jurisdiction over the provision of public access to safe and uniform means of vehicle-for-hire transportation originating within the City and County of Philadelphia (the relevant markets) to the PPA.

40. At all relevant times Defendant Uber had knowledge that said jurisdiction is exclusive pursuant to Chapter 55 of Title 53, 53 Pa.C.S. §5501 to 5517.

41. At all relevant times Defendant Uber ignored the exclusive jurisdiction of the PPA.

42. On **fourteen** separate occasions a court of competent jurisdiction found Defendant Uber to be subject to the exclusive jurisdiction of the PPA.. The forgoing fourteen rulings arose from the earliest of the one hundred seizures of Uber vehicles by the PPA for Uber's refusal to recognize the mandates of Chapter 55 of Title 53, 53 Pa.C.S. §5501 to 5517. Despite the seizures Uber increased the number of its vehicle operating in the relevant market to 1,700; one hundred more than the number of medallion cabs in service at October 2014.

43. At all relevant times Defendant Uber: (a) willfully disregarded the rulings of said court, (b) willfully disregarded the applicable law of the Commonwealth of Pennsylvania, and (c) excluded rivals on the basis set forth in ¶¶35 - 37, rather upon efficiency.

E.   **The Dangerous Probability of Uber Successfully Destroying Competition**

44.   Within the 18 month period after Defendant Uber entered the relevant markets the value of a medallion had decreased from $550,000.00 to $80,000.00, as a result of Defendant Uber's campaign to exclude and drive rivals from the relevant markets, as set forth in ¶¶35 - 37.

45.   Within the same 18 month period Defendant Uber's campaign eviscerated the ability of rival cabs to underwrite their operations, with 15% of Defendant Uber's rivals leaving the market.

46.   Within the same 18 month period Defendant Uber's rivals suffered (1) a 33.8% decrease in ridership and (2) 25% decrease in earnings over the preceding comparable time frame.

47.   During Defendant Uber's initial 18 months in the relevant market it had taken 700,000 riders on one million trips in the relevant market utilizing 1,700 vehicles and 12,000 cab drivers.

48.   While the Individual Plaintiffs financing system is deteriorating, Defendant Uber has $18 billion in capital,  providing it with the financial ability to buy every medallion in the market and be the only "player" therein.

## COUNT I

### CLAIM FOR RELIEF FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT 15 U.S.C. §2 & SECTION 4 OF THE CLAYTON ACT 15 U.S.C. §15

49.   The Individual Plaintiffs incorporate herein paragraphs 1- 48, *supra.*

14

50. Section 2 of the Sherman Act makes illegal an attempt to monopolize any part of the trade or commerce among the several states.

51. As set forth specifically in paragraphs 31- 48, Uber has, and continues to, attempt to monopolize the market for the provision of public access to safe and uniform means of vehicle-for-hire transportation within, and originating within, the City and County of Philadelphia.

52. As a consequence the Individual Plaintiffs have been injured in their business and property as set forth in paragraphs 31- 48, *supra*.

53. Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained."

**WHEREFORE** the Individual Plaintiffs request that the Court:

A. Adjudge and decree that the acts alleged herein is an attempt to monopolize the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. §2;

B. Enter judgment for the damages sustained by the Individual Plaintiffs, and for any additional damages, penalties and other monetary relief provided by applicable law, including treble damages as provided by Section 4 of the Clayton Act, 15 U.S.C. §15

C. Award such other relief as the Court deems just and proper.

## COUNT II

## STATE LAW CLAIM FOR DAMAGES ARISING FROM INTENTIONAL AND TORTIOUS INTERFERENCE WITH PRESENT AND PROSPECTIVE CONTRACTUAL RELATIONS

54. Individual Plaintiffs incorporate herein by reference thereto the allegations in paragraphs 1 - 53 above.

55. Prior to October 2014, the Individual Plaintiffs were operating approximately 7,000 to 8,000 cabs which were being driven by cab drivers who entered into contractual relationships with the Individual Plaintiffs pursuant to which the Individual Plaintiffs either leased medallions or cabs to those drivers.

56. These drivers in return were required to comply with the myriad costly statutory provisions and regulations administrated by the PPA which were necessary to safely and legally operate cabs in Philadelphia.

57. Where a driver leased a medallion from the Individual Plaintiffs, as opposed to leasing a cab, the driver would incur the cost of painting and badging the cab, all of which could cost as much as $16,000.00 to that driver.

58. When Uber started doing business in Philadelphia in October 2014, since it owned no cabs and employed no drivers and intentionally violated the statutory provisions and regulations as set forth above it substantially reduced the costs it would incur if it had been operating in accordance with those statutory provisions and regulations.

16

59.   Using these reduced savings in costs Defendant then set out on an intentional course of trying to get the drivers to break their lease obligations with the Individual Plaintiffs and get them to instead use their own vehicles to transport customers without incurring the costs those drivers would otherwise incur if operating legally under the regulations of the PPA.

60.   In carrying out this illegal conduct Defendant's business representatives would go to the 30th Street Railroad Station and the Philadelphia International Airport where taxi drivers are known to congregate on a daily basis for the purpose of transporting customers and offer to give them written material and applications for becoming Uber drivers.

61.   Defendant's representatives gave these drivers a variety of inducements in order to get them to break their contractual relationships with the Individual Plaintiffs and become Uber drivers, as set forth above.

62.   Defendant could only offer these inducements because of their intentional violations of the statutory and regulatory requirements enforced by the PPA.

63.   At the present time, and only over the course of eighteen months since Defendant began doing business in Philadelphia, it has succeeded in getting 1,200 of these drivers (17% of 7,000 drivers) to break their lease obligations with Plaintiffs.

64.   Many of the drivers who were induced to sever their contractual relationships with the Individual Plaintiffs had long term ongoing relationships with the Individual Plaintiffs and it could reasonably be anticipated that the relationship would continue but for the tortious conduct of Defendant.

65.   Defendant had no justification or privilege for engaging in the pattern of conduct set forth above.

17

66.   This intentional interference with the present and prospective contractual relationships that the Individual Plaintiffs' have and  would in the future have, has caused substantial economic harm to the Individual Plaintiffs which is in excess of $ 1,000,000.00.

**WHEREFORE** the Individual Plaintiffs request compensatory damages in such amount greater than $75,000.00 as the jury finds necessary to adequately compensate the Individual Plaintiffs for their loses and damages aforesaid and for punitive damages in such amount as the jury finds will punish Defendant and act as a deterrent to Defendant and others who commit similar acts in the future.

## COUNT III

### STATE LAW UNFAIR COMPETITION

67.   Individual Plaintiffs incorporate herein by reference thereto the allegations in paragraphs 1 - 66 above.

68.   Defendant has unfairly competed with Individual Plaintiffs by using the money it gained from its illegal operation in an attempt to drive the Individual Plaintiffs from the marketplace.

69.   A common law claim for unfair competition under Pennsylvania law includes tortious interference with contract, improper inducement of another's employees and claims designed to prevent a defendant from misappropriating the Plaintiffs business organization.

70.   Defendant's method of competition is not based upon superior business methods or technology but rather is based solely on the illegal conduct referred to above.

18

71.   The illegal conduct of Defendant in unfairly competing with the Individual Plaintiffs has caused substantial economic harm to the Individual Plaintiffs in excess of $1,000,000.00.

**WHEREFORE** the Individual Plaintiffs request compensatory damages in such amount greater than $75,000.00 as the jury finds necessary to adequately compensate the Individual Plaintiffs for their loses and damages aforesaid and for punitive damages in such amount as the jury finds will punish Defendant and act as a deterrent to Defendant and others who commit similar acts in the future.

Dated: March 15, 2016

**JOHN F. INNELLI, LLC**

John F. Innelli, Esquire
1818 Market Street, Suite 3740
Philadelphia, Pa. 19103

**FELL & SPALDING**

Stephen R. Bolden, Esquire
100 South Broad Street, Suite 2230
Philadelphia, Pa. 19110

19